EXHIBIT

B

1      UNITED STATES DISTRICT COURT
2      WESTERN DISTRICT OF KENTUCKY
          LOUISVILLE DIVISION
3       Case No. 3:18-cv-278-CHB

4    STEVEN NELSON                    )
                                      )
5              Plaintiff,             )
                                      )
6    VS.                              )
                                      )
7    COSTCO WHOLESALE CORPORATION     )
     UNKNOWN DEFENDANTS and           )
8    UNKNOWN EMPLOYEE OF COSTCO       )
                                      )
9              Defendants.            )

10

11

12        **DEPOSITION OF DAVID CHANGARIS, M.D.**

13

14   The deposition of DAVID CHANGARIS, M.D.,
     taken before Lynn B. Kornick, Court Reporter
15   and Notary Public in and for the
     Commonwealth of Kentucky, on the 9th day of
16   January, 2020, beginning at approximately
     4:22 P.M., at his office located at 801
17   Barret Avenue, Suite 103, Louisville,
     Kentucky.

18

19

20

21   -----------------------------------------------

22

23            **Lynn B. Kornick**
           *Court Reporter & Videographer*
              **11915 Brookmoor Drive**
24        **Louisville, Kentucky   40243**
                **502.500.7627**
25            **lynnkornick@msn.com**

8

1      A.   Yeah.  He may have come to the
2  office.  I may have discussed it with him.
3  I just don't remember.
4      Q.   Would you have charged for that?
5      A.   No.
6      Q.   How did Mr. Nelson come to see you?
7  Who referred him to you?
8      A.   Well, it was just initially -- and
9  still -- as an independent medical exam from
10  his law office.
11      Q.   His lawyer referred him to you.
12      A.   For an independent medical exam.
13      Q.   I understand.  But he was referred
14  to see you by his lawyer.
15      A.   Well, if you want to call that a
16  referral.  He purchased an independent
17  medical exam.  I do independent medical
18  exams.  Maybe five, 10 percent of my
19  practice is independent medical exams.
20      Q.   Well, maybe we're splitting hairs,
21  but you say he purchased.  You were paid by
22  his lawyer.
23      A.   Right.  For an independent medical
24  exam.
25      Q.   Have you done these independent

25

1    rating scale that is completed.  Would that

2    have been filled out by Mr. Nelson or

3    whoever was with him?

4         A.  Probably by interview.  If Mr.

5    Nelson didn't do it, it was probably by

6    interview.

7         Q.  When you scheduled Mr. Nelson's

8    examination, your office requested

9    radiographic films to assist in your

10   evaluation.  Did you ever receive any films?

11        A.  I actually don't recall receiving

12   films, but all I remember is receiving that

13   box of records.

14        Q.  Certainly, there are no films in

15   there.

16        A.  No.

17        MR. BROWN:  All right.  I'm going to

18   ask our court reporter -- and I'll want to

19   use some tabs to mark it.  The next exhibit,

20   Exhibit 4, will be your IME scheduling,

21   which directs the patient to bring available

22   radiographic studies with him to the exam,

23   and you also confirm your costs in the

24   evaluation, itemizing the difference between

25   a personal injury report, a workers'

32

1    something like that.  I'll have to see how I

2    sorted that out in my report.

3         Anyway, these are the kinds of

4    things that really I have found to be very

5    variable, you know, exactly when somebody

6    does what in terms of mobility, and I can

7    very rarely have that sorted out in the

8    timeframe of the event and the medical exam.

9    So I try not to focus too much and just deal

10   with the physical disability.

11        Q.  Any feel for how much time you did

12   spend during this examination with Mr.

13   Nelson?

14        A.  Probably an hour.

15        Q.  That long?

16        A.  You know, between talking to --

17   mainly talking to him and observing him and

18   trying to figure out what went on.

19        Q.  Yeah, you referenced that he likely

20   came with someone, perhaps a relative.  Do

21   you know specifically who would have

22   accompanied him to the examination?

23        A.  I have a little sticky note here --

24   Kristin Bassett.  I seem to recall that she

25   was a professional, like a physical

34

1      Q.   You told me a moment ago that his

2   pain was controlled with physical therapy

3   and chiropractic manipulation.

4      A.   Well, it's in my thing as one or the

5   other.   I have no evidence that he went to a

6   chiropractor.

7      Q.   That was going to be my next

8   question.   Do you --

9      A.   I just don't have any evidence that

10   he didn't go to a chiropractor.

11      Q.   In any event, you don't have

12   anything in your chart that would give us a

13   name of a chiropractor if, in fact, that

14   care was provided.

15      A.   No.   No.   It's just that my

16   checkpoint is not discriminating.

17      Q.   Do you record in your notes the name

18   of any medical care provider who is actively

19   involved in his care and treatment?

20      A.   Sometimes.

21      Q.   Did you do it in this case?

22      A.   Probably not.

23      Q.   Did you forward your final report to

24   any physician involved in his care and

25   treatment?

1    A.   No.

2    Q.   I know you reviewed some medical

3  records.  We're going to get to that as

4  well, but did you -- did you make any effort

5  to talk to anyone or contact anyone involved

6  in his care and treatment?

7    A.   I would doubt it.

8    Q.   Okay.

9    A.   Because that's not an ordinary part

10  of the IME.  I might do it in a setting

11  where there's some question about some

12  subtlety on a radiographic report.  I might

13  call up a radiologist to say would you

14  please do measurement at such-and-such an

15  angle or something, but I don't ordinarily

16  speak to a treating physician, although

17  occasionally I do.

18    Q.   Certainly, if you, through your

19  examination, found anything that was life

20  threatening or life altering that required

21  immediate treatment, you would --

22    A.   I would send them to the emergency

23  room.

24    Q.   Okay.  And you wouldn't hesitate

25  about doing that.

38

1          Q.   Okay.   That may be irrelevant, but
2     I'm just saying, have you formed an opinion
3     one way or the other?
4          A.   It's both irrelevant and I have no
5     way of knowing.
6          Q.   In the course of your review of the
7     Norton Brownsboro records -- and I don't
8     want to be presumptuous in any way, so let
9     me ask it this way.   Did you look at any
10    medical records predating Mr. Nelson's fall
11    at Costco in April 2017?
12         A.   I list here all the medical records
13    that I have through what I saw, and so there
14    should be a list here listing all the
15    medical records, and I honestly don't see --
16    here it is.   The records reviewed, but they
17    don't list the dates.   Part of it is they
18    are so voluminous.
19              So if it's -- the records I reviewed
20    are in that box.   If you want me to go
21    through and identify which dates are in that
22    box, I will.   I have no idea what I saw.   If
23    you want me to photocopy that box and get it
24    to you, I'll do that.
25         Q.   Okay.   Records reviewed are EMS --

39

1  and I'll represent to you the only EMS

2  record I have is an EMS transport occurring

3  before the Costco fall.  Do you have EMS

4  records referencing transport as a result of

5  the --

6      A.  I have no idea.  This is how we

7  categorize that huge stack of papers.  It

8  would have taken us 10 pages of independent

9  records to document that.

10      Q.  Here is the Louisville Metro EMS

11  records and the date of service is

12  referenced as 12/11/2015, two years before

13  the fall.

14      A.  Well, that's fine.  Yes.

15      Q.  Okay.  All right.  You don't recall

16  having any other EMS records, do you?

17      A.  I have no independent recollection

18  of what's in that box, sir.

19      Q.  And then I did flip through these

20  Norton records and it appears to me that it

21  is the medical chart applicable to his

22  admission on April 4, 2017, and you can look

23  through them if you want to verify that, but

24  they're numbered, they're paginated, and

25  that's what they reference.

40

1      And assuming that to be the case, do

2  you know whether you have looked at a single

3  medical record applicable to care provided

4  to Mr. Nelson before April of 2017?

5      A.  I have no independent recollection

6  of that.  If it's not in that box, I didn't

7  look at it.

8      Q.  Okay.  I didn't see it in that box,

9  so let's see if we can't move on.

10      Your involvement doing evaluations

11  for patients involved in accidents -- and

12  you told me that was the vast majority of

13  your practice.  Any feel for what percentage

14  of your income is related to the evaluation

15  of the patient at the request of an attorney

16  and giving depositions?

17      A.  Well, I don't give a whole bunch of

18  depositions, so it's hard for me to know.

19  You know, I probably did -- as I said, I

20  probably do about 10 to 15 depositions a

21  year at most.

22      Q.  How long have you been doing that?

23      A.  Well, I was licensed in Kentucky in

24  1984.  So I've been doing depositions since

25  then.

43

1      A.   Okay.

2      Q.   So have you been named as a

3  defendant in a medical malpractice action?

4      A.   I was named in one many years ago.

5  It was dismissed with prejudice.

6      Q.   And when was the last time you

7  actively performed surgery?

8      A.   1997.

9      Q.   Have you ever had your

10  qualifications questioned, investigated,

11  suspended or altered in any way by a

12  reviewing organization?

13      A.   I've never really had any change in

14  my practice rights or anything like that.

15      Q.   How about disciplinary proceedings?

16  Ever been the subject of a disciplinary

17  proceeding?

18      A.   There was a board action about 10

19  years ago that dealt with -- it turned out

20  to be bookkeeping, and I took a course on

21  bookkeeping and the like.

22      Q.   Do you have hospital privileges --

23      A.   No.

24      Q.   -- at the current time?  You do not?

25      A.   No, sir.

44

1      Q.   When's the last time you had
2    hospital privileges?
3      A.   1997.
4      Q.   You told me that Dr. Nazar works in
5    this office as well.  Do you know if Dr.
6    Nazar has hospital privileges at the current
7    time?
8      A.   I'm not fully aware of what level of
9    hospital privileges.  I do know that he does
10   operate from time to time.
11     Q.   Well, he'd better have hospital
12   privileges if he's doing surgery then, I
13   think.
14     A.   Again, but I haven't talked to him
15   about this probably in four or five months
16   or so.  That's his -- since I don't go to
17   the hospital, I don't tend to talk about
18   hospitals.
19     Q.   Would it be accurate to say that
20   your involvement with Mr. Nelson then was
21   just to independently evaluate him and not
22   to become engaged in providing treatment to
23   him?
24     A.   Yes, sir.
25     Q.   We talked about medical records that

45

1    you were provided.  Would those medical

2    records have been provided to you by Mr.

3    Nelson's attorneys in all likelihood?

4        A.  Again, I don't keep track of who

5    does this, but if I had a $2 bet, I'd say

6    these were provided by Mr. Astorino or his

7    firm.  But, again, I don't know who brings

8    the -- I actually do have a rare patient

9    that will show up with a ton of records.

10        Q.  But you don't recall that being Mr.

11   Nelson.

12        A.  I don't recall one way or the other.

13   So I don't want to say definitively that

14   this was Mr. Astorino's work.

15        Q.  Is it your belief, based upon either

16   medical records that you've received or your

17   interaction with Mr. Nelson, or all of the

18   above, that he suffered a traumatic brain

19   injury when he fell at Costco back in April

20   of 2017?

21        A.  Technically, to be absolutely

22   specific, I think he has suffered -- let me

23   just make sure that we get the right wording

24   on this.  I think I wrote vertigo of central

25   origin and peripheral origin.  He has a

46

1   traumatic brain injury with right

2   hemiplegia, status post personal injury, and

3   he has a dizziness handicap injury.

4        Now, the traumatic brain injury is

5   -- you can argue that on language and

6   definition, but what I'm going to stand on

7   is the vertigo of central origin, and I have

8   evidence of that and vertigo of peripheral

9   original, and the vertigo of central origin

10  is the brain stem.

11       Now, what happens to people who have

12  brain stem injuries, which is part of the

13  brain, is that they have a higher propensity

14  for developing strokes after the brain

15  injury. Much higher incidents, especially

16  in the first five years after it happens.

17       So it's sometimes -- it was really

18  hard in this case to know whether he had had

19  a stroke after the accident or whether he

20  had had one of the conditions that I had --

21  I couldn't tell when the hemiplegia quite

22  frankly began from his testimony to me.

23       I would need much more information

24  to define specifically, and I felt it really

25  didn't matter because, either way, he had a

50

1   fall but, since the fall, he had gotten

2   worse in his cognitive capacity and his

3   physical capacity.

4        Q.   Other than that representation by

5   his daughter, have you seen anything in any

6   medical record that would indicate that Mr.

7   Nelson experienced a stroke to any degree --

8        A.   No.

9        Q.   -- since his fall?

10       A.   No, no.  Just -- and the daughter's

11  a physical therapist, and so I tend to

12  weight it very highly, and so, as I said,

13  these -- it's very hard to delineate the

14  time course of when this man was doing what

15  after the accident.

16       Q.   How about before the accident?  What

17  was he doing before the accident?

18       A.   I don't have that information on

19  that right now.

20       Q.   Well, before you comment on

21  causation based on how a person is doing at

22  a given time today, you've got to have some

23  history to determine whether or not there's

24  been an improvement or a worsening in --

25       A.   Well, the history I have is I have

51

1    relied heavily on the daughter, the physical

2    therapist.

3        Q.   Okay.   Did he have a stroke before

4    his fall at Costco?

5        A.   All I know is that he progressed.

6        Q.   Well, that's not my question.   Did

7    he have a stroke?

8        A.   I don't have any information on

9    that, sir.

10       Q.   You don't know if he had a stroke or

11   not.

12       A.   No.

13       Q.   Or how many strokes he may have had.

14       A.   No.

15       Q.   Would that be important to you?

16       A.   Eventually, I'd like to have that

17   information.

18       Q.   Okay.

19       A.   But this -- I'm giving you my

20   opinions based upon my exam at the time and,

21   if I get a different history, I'll change my

22   opinions.

23       Q.   Well, I'm going to represent to you

24   he had not one but two strokes before his

25   fall in Costco.   Does that change your

56

1    it's been so difficult saying in football

2    and why kids get put back in the game and

3    end up dead with a second brain injury.

4    Because they're walking around.

5        Q.   Let me look at your chart real

6    quick.   Is his dizziness, in your opinion, a

7    symptom of this brain injury?

8        A.   Of his vertigo of central origin,

9    yes.

10       Q.   Okay.   And you believe that's

11   related to the fall?

12       A.   By the history, yes.   Regard -- even

13   if he had it before, the daughter says that

14   all this stuff was made worse.

15       Q.   The daughter who accompanied the

16   patient, Mr. Nelson --

17       A.   Right.

18       Q.   -- to see you --

19       A.   Right.

20       Q.   -- based on a referral from his

21   lawyer.

22       A.   Right.

23       Q.   Okay.

24       A.   I might add that I don't write the

25   report.   This is written by an independent

57

1    neurologist, and I sign the report and I

2    approve it because I understand it and I see

3    the original data that he does, that he

4    uses, and so -- you know, it's -- you can't

5    fake those things.

6         Now, you can always say that he had

7    problems before, but you have to go by

8    history.  I'll need a whole lot more history

9    to -- before I change my opinion.

10        Q.  Well, you told me just a few moments

11   ago that you try not to get involved in

12   addressing causation before or after a

13   specific event.

14        A.  I don't like to do that.

15        Q.  Are you doing it in this case?

16        A.  Yeah.

17        Q.  Yeah.

18        A.  Based upon the history.

19        Q.  Given by the daughter.

20        A.  Given by the daughter mainly.

21        Q.  But not by any medical records.

22        A.  Not by medical records, because we

23   know by document -- and I can show you lots

24   of papers, and there's one in particular

25   that's particularly gruesome of the

60

1    illustrations that are contained in his

2    chart.

3               (THE DOCUMENTS WERE MARKED IN

4    ABSENTIA FOR PURPOSES OF IDENTIFICATION

5    COLLECTIVELY AS DEFENDANTS' EXHIBIT 8.)

6               MR. BROWN:  Where is the -- where is

7    that portion of the chart that was on the

8    left?

9               MR. ASTORINO:  Right there.  All

10   those with hole punches in them.

11              MR. BROWN:  Yeah, this was Exhibit

12   3.

13       Q.  (BY MR. BROWN)  All right.  I asked

14   you about the document that is contained in

15   the IME packet, and it does contain

16   handwriting not yours, but you thought it'd

17   be a pretty good guess that it was probably

18   completed by his daughter.

19       A.  I don't have a way in knowing.

20       Q.  I'm interested in this because it

21   does ask for medical history.  You see on

22   Page 2?

23       A.  Right.

24       Q.  Okay?  And it looks like either Mr.

25   Nelson or someone on his behalf has followed

61

1    the directive to check symptoms you

2    currently have or have had in the past.  You

3    see that?

4         A.   Yes.

5         Q.   Okay.  Is dizziness checked?

6         A.   No.  But that's not uncommon.

7         Q.   That's right.  You told me that,

8    because medical records can be inconsistent,

9    right?

10        A.   Well, the reason why is that

11   dizziness is such an unpleasant feeling that

12   people compensate by not moving, and it's

13   not until you actually tell them that you're

14   interested in dizziness specifically -- like

15   in the dizziness handicap quotient, for

16   example.

17        If you look at the dizziness

18   handicap index, you'll see that he answers a

19   lot of questions that are clearly positive,

20   okay, for having symptoms of dizziness.

21        But oftentimes people just --

22   they'll say no on the intake, because they

23   don't even think dizziness is related to

24   anything.  Nobody has taught them that

25   dizziness is a sign of a concussion.

62

1      Q.   Well, let's talk about the dizziness

2   or the vertigo.   Is that the same thing,

3   dizziness and vertigo?

4      A.   Probably.   I mean, there's -- you

5   could say that vertigo encompasses

6   dizziness, but they're pretty much, in my

7   opinion, very closely aligned.

8      Q.   Okay.   Are you able to tell me how

9   long his vertigo or dizziness may have been

10   present?

11     A.   No.   The only thing I can tell you

12   is that the daughter says he's worse and

13   he's getting worse.   He's progressing in his

14   difficulty with arm movement, balance and

15   his thinking.   So, because of that and the

16   history of the trauma, that -- I believe

17   that the trauma is contributing to that.

18          Whether it's the sole cause of the

19   dizziness and the vestibular signs and the

20   difficulty of staying on task and things

21   like this is a question that's going to have

22   sort of be sorted out as we go along,

23   because I don't have access to all the

24   information.

25     Q.   Yeah, and, as I understand it, you

63

1   can only make your opinions based upon

2   records provided to you that you've

3   reviewed.

4        A.   Right.   That's right.   If you give

5   me records that are different, you're going

6   to get a different opinion.

7        Q.   Can stroke cause dizziness or

8   vertigo?

9        A.   Yes.   Of course.   Sure.

10       Q.   And what about medications,

11  specifically seizure medications?

12       A.   Oh, yes.   All the medications can.

13       Q.   Okay.

14       A.   But in general, what we do -- and

15  it's specific, you'll see in the records

16  surrounding the VNG -- is we ask people to

17  be off all medicines, unless they are things

18  like insulin, for 24 hours prior, 24 to 48

19  hours prior to the VNG, and we document

20  that, what medicines they've had within the

21  period of time prior to the VNG.   We're

22  sticklers about that.

23       Q.   Where would that be documented?

24       A.   In the stack of papers surrounding

25  the VNG.   There should be a stack of papers

68

1  might be extensive history.

2       Q.   What about cancer?  Do you see where

3  there's a history of cancer per client

4  report.  Any feel for the extent of cancer

5  or what type of cancer?

6       A.   No.   Nothing.

7       Q.   Do you know if he's had any

8  treatment for cancer since he last saw you

9  in April of 2019?

10      A.   No, sir.  I figured if -- my job was

11  to look at his brain and see if it's working

12  and see if it's not working and if there's

13  any coherent rationale between where he's at

14  and the history that the daughter gave with

15  him progressing.

16      Q.   Well, when you say look at his

17  brain, but you haven't looked at any

18  radiographic studies, either a CT scan or

19  MRI, correct?

20      A.   No.  But in general, those are

21  normal -- when I look at people's brains,

22  I'm -- I think the little squiggles of the

23  eye movement on the VNG are probably about

24  the most sophisticated view of --

25      Q.   Yeah.

69

1        A.   -- the brain that we have in
2   medicine.
3        Q.   Do you think an MRI or CT scan with
4   contrast would be normal in an individual
5   with a history of two strokes?
6        A.   Hopefully not.
7        Q.   All right.   Your
8   neurological/physical examination shows a
9   six-foot, 155-pound male, and it reflects
10  that there was an examination of his head
11  and neck.   Do you see that?   See where I am
12  on Page 2?
13       A.   (Reviews document)   Okay.
14       Q.   And he showed normal mentation in
15  terms of ideation and coherent thoughts.
16  What's that mean?
17       A.   He carried on a conversation.
18       Q.   And his grasp of recent current
19  events was appropriate for his age, 70.
20       A.   I felt.   That's a very low bar.
21       Q.   On Page 3, you do reference looking
22  at some X-rays but only of his chest and his
23  right knee and right --
24       A.   No.   No, that's X-ray reports.
25       Q.   Okay.   You did not look at X-ray

70

1   reports of his brain imaging, did you?

2       A.   Probably because we couldn't find

3   them.

4       Q.   Well, you didn't go looking for

5   them.   Everything you reviewed was given to

6   you by the attorney, right?

7       A.   Right.   But we couldn't find it in

8   that box, because we report most of the

9   diagnostic tests.

10      Q.   Then you go on to say causation, and

11  you told me you are not inclined to give

12  opinions on causation but, in this

13  particular case, based on the history you

14  received, the results of the examination

15  performed and your professional training and

16  experience, that you formed the opinion that

17  the above injuries are more likely than not

18  caused by or brought into disabling reality

19  by the injury of April 3, 2017.

20          What above injuries are you talking

21  about in this report?

22      A.   Well, in this report, I had not made

23  the diagnosis of vertigo of central origin.

24      Q.   I get it.   But what injuries are you

25  talking about?